**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

United States of America,

         Appellant,

v.

Robert A. Mackenzie,

         Appellee.

No. CV-20-02200-PHX-DWL

**ORDER**

## INTRODUCTION

In 2010, Michael A. Leite and Andrea C. Carvalho ("Debtors") filed a late income tax return for fiscal year 2009 and reported no taxes. The Internal Revenue Service ("IRS") issued Debtors a refund but later reexamined Debtors' tax return and found that Debtors had significantly underreported their taxes owed. The IRS assessed additional taxes, penalties, and interest on both the taxes and penalties. The IRS then secured a federal tax lien (the "Tax Lien") against Debtors' house in Connecticut (the "Property").

In 2019, Debtors filed a petition for Chapter 7 bankruptcy. The IRS filed a proof of claim, which included a secured claim for the taxes (the "Taxes"), penalties (the "Penalties"), and interest on both.[1] The Property was later sold, but after satisfying other costs and claims on the Property, the proceeds from the sale (the "Proceeds") were not enough to pay the full amount of the IRS's claim. The Trustee then instituted an adversary

---

[1] The Court refers to these two categories as Taxes and Penalties for ease of reference, although both categories also encompass interest on each respective amount.

proceeding to avoid the Tax Lien and preserve it for the benefit of the bankruptcy estate. The Trustee filed a motion for summary judgment, arguing that the Proceeds should be allocated on a pro rata basis between the Taxes (unavoidable claim still held by the IRS) and the Penalties (avoided and preserved claim held by the Trustee).  The Trustee also argued that Debtors' anticipated tax refund (the "Refund") from their 2017 tax return, which had not yet been processed at the time, should be applied to offset the Taxes.  The government opposed summary judgment, arguing that the Proceeds should be applied to the Taxes, not the avoided Penalties.  After holding oral argument, the bankruptcy court ruled from the bench, granting summary judgment to the Trustee on the allocation issue and declining to decide how to allocate the Refund, which had been processed the night before oral argument.

The government now seeks review of the bankruptcy court's order.  For the following reasons, that order is affirmed in part and reversed in part.

## BACKGROUND ON BANKRUPTCY CODE PROVISIONS

I.   <u>Avoidance</u>

Under § 724(a) of the Bankruptcy Code, a trustee may "avoid" a "lien that secures a claim of a kind specified in section 726(a)(4)," such as a lien for pre-petition tax penalties.[2]   When a trustee avoids a lien, the lien is essentially transformed into an unsecured claim, which maintains a lower priority in the distribution of bankruptcy estate assets.  *See, e.g.*, *In re Gill*, 574 B.R. 709, 717 (9th Cir. BAP 2017) ("[I]t is clear by operation of §§ 724(a) and 726(a)(4) that a penalty which is secured by a tax lien is automatically demoted in a chapter 7 case from the highest priority to the lowest priority, payable only after general unsecured creditors are paid in full."); 6 Collier on Bankruptcy ¶ 724.02[6] (16th ed. 2012) ("In enacting section 724(a), . . . Congress made a policy

---

[2]      Section 726(a)(4) concerns, among other things, "payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture."  A lien for pre-petition tax penalties falls within § 726(a)(4).  *See, e.g.*, *In re Hutchinson*, 579 B.R. 860, 862 (Bankr. E.D. Cal. 2018) ("Section 726(a)(4) encompasses a broad spectrum of fines, penalties, and forfeitures, including tax penalties."); 6 Collier on Bankruptcy ¶ 726.02[4] (16th ed. 2012) ("[S]ection 726(a)(4) includes prepetition tax penalties if they are not compensation for actual pecuniary loss.").

1    determination that payment of claims for penalties or punitive damages should be

2    subordinated to payment of general unsecured claims.").

3    II.    Preservation

4            Under § 551 of the Bankruptcy Code, "[a]ny transfer avoided under section

5    522 . . . or 724(a) . . . is preserved for the benefit of the estate but only with respect to

6    property of the estate."[3]    In essence, this permits the trustee to recover the value of the

7    avoided claim and use it to "increase the assets of the estate for distribution to creditors."

8    *In re Heintz*, 198 B.R. 581, 585 (9th Cir. BAP 1996). *See also* 11 U.S.C. § 541(a)(4) ("[The

9    bankruptcy] estate is comprised of . . . [a]ny interest in property preserved for the benefit

10   of . . . the estate under section . . . 551 . . . ."). Section 551 "serves as a 'follow-up' provision

11   explaining how assets and property avoided under other Code provisions should be

12   handled." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 774 (D.N.J. 2013).

13           "Once a trustee recovers an asset for the estate through one of the transfer or lien

14   avoidance provisions, § 551 automatically preserves the asset for the estate." *Heintz*, 198

15   B.R. at 584. *See also In re Trible*, 290 B.R. 838, 844 (Bankr. D. Kan. 2003) ("As this

16   Court reads § 551, upon avoidance of [the] lien . . . , the lien is *automatically* preserved for

17   the benefit of the estate."). "The rationale behind the automatic preservation rule for

18   transfers and liens avoided by a trustee in bankruptcy is that the estate should benefit from

19   each avoidance rather than promoting the priority of unavoidable junior secured interests

20   who would otherwise improve their positions at the expense of the estate." *Matter of

21   DeLancey*, 94 B.R. 311, 313 (Bankr. S.D.N.Y. 1988). In other words, when a trustee

22   avoids a lien, preservation allows the trustee to occupy the priority of the avoided lien and

23   use that priority to distribute estate assets to unsecured creditors. *In re Haberman*, 516

24   F.3d 1207, 1210 (10th Cir. 2008) ("[T]he trustee, on behalf of the entire bankruptcy estate,

25   in some sense steps into the shoes of the former lienholder, with the same rights in the

26

27   [3]    The term "transfer" includes the "creation of a lien." 11 U.S.C. § 101(54)(A). *See
         also In re Haberman*, 516 F.3d 1207, 1210 & n.4 (10th Cir. 2008) (classifying liens as a
28   subset of transfers); 5 Collier ¶ 551.02[1] ("Section 551 preserves only 'transfers' and
         'liens.'").

collateralized property that the original lienholder enjoyed.  Likewise, the trustee, on behalf of the entire estate, assumes the original lienholder's position in the line of secured creditors; in this way,  Congress sought to assure that the avoidance of a lien doesn't simply benefit junior lienholders who would otherwise gain an improved security position and might, when the estate is limited, prove the only beneficiaries of the trustee's actions.").  Without preservation, junior lienholders would jump in priority, be able to obtain a greater share of the estate, and leave less available for distribution to unsecured creditors.  *In re Seibold*, 351 B.R. 741, 746 (Bankr. D. Idaho 2006) ("[Section 551] operates to preserve an avoided lien for the benefit of the bankruptcy estate so as to permit the trustee to step into the position of the creditor whose lien has been avoided, thereby preventing a junior lien holder (or a debtor) from improving its position at the expenses of a debtor's unsecured creditors.").

III.   Distribution Of Property/Proceeds

Under § 724(b) of the Bankruptcy Code, if an estate has an interest in property or proceeds of property[4] subject to an unavoidable lien "that secures an allowed claim for a tax," the property or proceeds are distributed as follows:

(1)   first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such tax lien;

(2)   second, to any holder of a claim of a kind specified in [certain portions of § 507];

(3)   third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien exceeds any amount distributed under paragraph (2) of this subsection;

(4)   fourth, to any holder of any allowed claim secured by a lien on such property that is not avoidable under this title and that is junior to the tax lien;

(5)   fifth, to the holder of such tax lien, to the extent that such holder's allowed claim secured by such tax lien is not paid under paragraph (3) of this subsection; and

(6)   sixth, to the estate.

---

[4]   "Section 724(b) applies to all types of property in which the estate has an interest . . . . regardless of whether possession of the property is in the hands of the trustee, lienholder, or other party."  6 Collier ¶ 724.03[1].

In other words, "when the property or proceeds of such property in which the estate has an interest is subject to a lien that is not avoidable under Title 11, and the property also secures an allowed claim for a tax, the property is distributed first to any holder of an allowed claim that is secured by a lien on that property that is not avoidable and is senior to the tax lien.  Second, to the extent of the amount of the allowed tax claim secured by the lien, the property is distributed to those creditors holding claims of a kind specified in Section 507(a)(1)-(7) in the order of priority.  Third, the property is distributed to the holder of the tax lien to the extent that the tax claim secured by the tax lien exceeds any amount distributed under Section 724(b)(2).  Fourth, the proceeds are distributed to junior lien holders.  Fifth, the proceeds are distributed to the tax collector to the extent that he was not paid under paragraph (3).  Any remaining property belongs to the estate."  *In re C.J. Milligan, Inc.*, 252 B.R. 465, 468 (Bankr. E.D. Mo. 2000) (citations omitted).

"The purpose of Section 724(b) is to subordinate a perfected tax lien to senior liens and administrative expenses of the case (including wages, certain taxes and creditor expenses, and attorneys' fees).  Certain priority claimants effectively step into the shoes of the lien tax creditor."  *In re Buzzworm, Inc.*, 178 B.R. 503, 510 (Bankr. D. Colo. 1994).  "By its terms, section 724(b) does not apply if the lien securing the claim for taxes is avoidable under any section of the bankruptcy code.  If the lien can be avoided under another section of the Code, then the avoided lien would be preserved for the benefit of the estate and the preserved item would not be subject to section 724(b)."  6 Collier ¶ 724.03[3].

## FACTUAL AND PROCEDURAL BACKGROUND

I.   <u>Bankruptcy Proceedings</u>

In November 2010, Debtors filed their (late) joint income tax return for fiscal year 2009.  (Doc. 7-6 at 62-64.)  Debtors reported that they did not owe any taxes.  (*Id.*)  In December 2010, the IRS issued a refund of $2,616.  (*Id.*)

In May 2011, the IRS examined Debtors' tax return and found it wanting.  (*Id.*)  The IRS assessed $51,441 in additional taxes against Debtors, along with penalties and interest.

1    (*Id.*)

2        In December 2013, the IRS recorded a federal tax lien against Debtors in

3    Connecticut, where they then resided, totaling $72,724.38.  (*Id.*; Doc. 7-5 at 6.)

4        In December 2016, the IRS assessed an additional penalty against Debtors for late

5    payment of the taxes owed, plus interest.  (Doc. 7-6 at 63.)

6        In September 2019, Debtors filed a voluntary petition for Chapter 7 bankruptcy.

7    (Doc. 7-3 at 10-11.)

8        In November 2019, the IRS filed a proof of claim in Debtors' bankruptcy case for a

9    total of $83,702.22.  (Doc. 7-4 at 1-3.)  The IRS subsequently amended its claim in May

10   2020.  (*Id.* at 5-7.)  The amended claim was composed of $81,174.14 in secured claims,

11   $2,325.55 in unsecured priority claims, and $202.54 in unsecured general claims.  (*Id.* at

12   8.)  Included in the secured claims were $26,900.19 for taxes owed, $19,038.80 for interest

13   on the taxes owed, and $35,235.14 for penalties and interest on the penalties.  (*Id.*)[5]

14       During the bankruptcy proceeding, the Property was sold.  (Doc. 7-6 at 24 ¶ 8; Doc.

15   7-7 at 2 ¶ 8.)  After satisfying the costs of the sale and senior liens on the Property, the

16   remaining Proceeds totaled $36,642.80.  (*Id.*)

17       In May 2020, the Trustee filed an adversary proceeding against the government.

18   (Doc. 7-5 at 1-4.)  The Trustee alleged that he could avoid the Tax Lien under § 724(a) and

19   preserve it for the benefit of the estate pursuant to § 551.  (*Id.*)  The Trustee also alleged

20   that, to the extent the Tax Lien was not avoidable, the Proceeds should be used to pay the

21   estate's administrative expenses.  (*Id.*)

22       In June 2020, the Trustee moved for summary judgment on the above issues as well

23   as on the issue of proper allocation of the Proceeds.  (Doc. 7-5 at 15-23, 34-43.)[6]  The

24   Trustee argued that, because there was "one lien that secure[d] two distinct debts, the taxes

25   and the penalties, and since the trustee [could] take over (avoid and preserve) the lien to

26   _____

[5]    The "IRS software that generates bankruptcy claims includes only the interest on
tax in the interest column," so "[p]enalty interest appears in the penalty column."  (Doc. 7
at 6 n.5.)

[6]    The Trustee later filed an amended motion for summary judgment.  (Doc. 7-5 at 34-
43.)

the extent that it secure[d] the penalties, the lien . . . serve[d] two masters—the IRS and the bankruptcy estate." (*Id.* at 39.) Thus, the "only way to allocate the proceeds of the lien [was] on a *pro rata* basis" because there were "two parties with equal rights to the proceeds of that lien." (*Id.*)

In July 2020, the government filed its response in opposition to the Trustee's motion for summary judgment. (Doc. 7-6 at 27-46.) The government argued that, under § 724(b), "unavoidable tax liens [must be] paid before estate funds can be applied towards avoided penalty liens." (*Id.* at 32.) In other words, the government argued that the Proceeds should be applied in total to the Taxes, with any funds remaining to be applied to the Penalties. (*Id.* at 37-40.)

On September 3, 2020, the bankruptcy court held oral argument on the Trustee's motion for summary judgment. (Doc. 7-8 at 1-41.) After hearing from the parties, the bankruptcy court ruled from the bench, granting the Trustee's motion for summary judgment but declining to consider how to allocate the Refund. (*Id.* at 25-41.) The bankruptcy court ordered the Trustee to prepare a proposed order consistent with its ruling. (*Id.* at 39.)

On September 25, 2020, the Trustee filed the proposed order, which noted that the parties could not agree on its content. (Doc. 7-7 at 25-28.)

On October 1, 2020, the government filed its objection to the proposed order. (*Id.* at 29-35.) The government argued that the proposed order was inconsistent with the bankruptcy court's ruling because the proposed order allocated specific dollar amounts to the Taxes and Penalties, which implicitly determined that the IRS wouldn't be able to apply the Refund to the Debtors' tax liabilities, an issue the bankruptcy court hadn't decided. (*Id.* at 32-33.) That same day, the Trustee filed his response to the objection. (*Id.* at 36-40.)

On October 8, 2020, the bankruptcy court held oral argument on the Trustee's proposed order and the government's objection. (Doc. 7-8 at 42-51.) After hearing from the parties, the bankruptcy court determined that it would take an "amalgam approach" between their respective positions. (*Id.* at 51.) That same day, the bankruptcy court filed

its final order.  (Doc. 7-7 at 42-43.)

On October 22, 2020, the government filed a motion to alter or amend, in part, the bankruptcy court's final order to address what the government perceived as the "internal inconsistency" it raised in its objection to the Trustee's proposed order.  (*Id.* at 46-61.)  The government further argued that the "overpayment allocation issue must be resolved before a final order can be properly entered" and before the order could be "final and appealable." (*Id.* at 50-51.)

On November 2, 2020, the bankruptcy court denied the government's motion, construing it as a motion for reconsideration.  (*Id.* at 62-65.)

II.     The Bankruptcy Court's Decision

   A.     **Motion For Summary Judgment**

      1.     Undisputed Matters

The bankruptcy court noted that several facts and issues were not in dispute.  The parties did not dispute that the Trustee could avoid the Penalties.  (Doc. 7-8 at 25.)  Nor did the parties dispute the essential facts: "that the Debtor owned real property in Connecticut that had no exemption, that with the consent of the IRS the Trustee in fact sold the property and paid the costs of sale and the senior liens and that there's $38,640.80 remaining proceeds from the same."  (*Id.* at 26.)  The parties also didn't dispute that the IRS had a valid tax lien, there were no junior liens below the Tax Lien, and the IRS had filed a proof of claim for $81,174.13, composed of taxes, penalties (plus interest on the penalties), and interest on the taxes.  (*Id.*)  Last, the parties agreed that there were "no facts that would preclude a ruling . . . and that the issues [that were] brought [were] all legal in nature."  (*Id.* at 27.)

      2.     Allocation Of The Proceeds

As for the allocation of the Proceeds, the bankruptcy court noted that the "case law on [the] matter generally is sparse" and that the court "could not find a case that supported the IRS' position as to the issue of how [to] apply 724(b) or whether 724(b) applies in the instance . . . where . . . [there is] an avoided tax claim in part avoided under 724(a)."  (*Id.*)

- 8 -

The court noted the existence of a Bloomberg treatise, which "set forth an example . . . [of] a Trustee having avoided penalties and, in fact, followed the methodology . . . urged by the IRS . . . to the extent that the Trustee was to be paid last." (*Id.* at 27-28.)  But according to the bankruptcy court, the "problem with the Bloomberg article" was that it "cited to no case support for its rendition of how the proceeds should be properly applied," and the court was "unable to find any court or other authority that [had] cited the Bloomberg Treatise with approval." (*Id.* at 28.)

After discussing the holdings of *Hutchinson* and *Hannon* (*id.* at 28-33), the bankruptcy court decided to follow their approach because it was the "cleanest way to interpret [sections] 551, 724(a) and 724(b) in a consistent manner" (*id.* at 33).  The court reasoned that the "purpose of Section 551 is to allow the Trustee to step into the shoes of an avoided lien and Section [7]24(a) . . . is incorporated in 551." (*Id.*)  The court further reasoned that, if the IRS's approach were adopted, it would "have the effect of elevating . . . junior liens over the avoided lien of the Trustee, which appears contrary to the language and the purpose of 724(a) and 551." (*Id.*)

Deciding between a pro rata allocation (advocated by the Trustee) and a tax-first allocation (advocated by the government), the bankruptcy court stated that the "Bankruptcy Code follows lien priority set by state law" but there "isn't much to give us in the way of state law as to what has to happen legally or federal law, for that matter, when there's various [parts] to a single lien." (*Id.* at 34.)  Although the court understood the government's "argument that whether they have a lien or not, if we're just talking about a claim generally, they would apply first . . . to the tax itself and the interest and then thereafter the penalty," the court stated that this argument didn't "really answer[] the question of once something is combined in a single lien who has lien priority." (*Id.* at 34-35.)  The court adopted the Trustee's pro rata approach because it made "the most sense," "although [the court] was not able to find any cases [or] authority either way." (*Id.* at 35.)

### 3.   Allocation Of The Refund

As for how to allocate the Refund, the bankruptcy court noted that it was "not sure

at this point [whether the Refund would], in fact, be awarded and either be used potentially as a set off by the taxing authority or potentially become an asset of the estate." (*Id.* at 36.) The court decided that it would be "premature for [it] to rule on that issue simply because [it didn't] yet know, in fact, whether there [was] going to be a refund." (*Id.*)

### B.   Final Order

On October 8, 2020, the bankruptcy court issued its final order.  (Doc. 7-7 at 42.) The court held as follows:

- The Tax Lien was avoided under § 724(a) "to the extent of the penalties and the interest on the penalties totaling $35,235.14."

- The avoided Penalties were preserved for the benefit of the estate under § 551.

- The "unavoided portion of the tax lien" remained attached to the Proceeds.

- The bankruptcy estate was "entitled to a pro-rata portion of the [Proceeds], in proportion to the share of the [Penalties] vis a vis the [Taxes], for distribution free and clear of any further lien, claim or interest of the [government]."

- The Trustee would "continue to hold the pro rata portion of the [Proceeds] attributable to the [Taxes], pending further order of the [bankruptcy court]."

- The "disposition of the [Refund was] not decided . . . and [would] await agreement of the parties or further order of the [bankruptcy court]."

- The Trustee's "request for an order determining that the unavoided portion of the lien [would] be used to pay administrative expenses pursuant to [§ 724(b) was] denied without prejudice."

(*Id.* at 42-43.)

### C.   Motion For Reconsideration

As noted, the bankruptcy court denied the government's motion to alter or amend the final order, which the bankruptcy court construed as a motion for reconsideration.  (*Id.* at 63-65.)  The court noted that the government's "current arguments were largely raised

1   in its objection to the Trustee's form of order and discussed at the October 8, 2020, hearing

2   on such objection." (*Id.* at 62-63.)  The court disagreed with the government that there was

3   any internal inconsistency in the final order and found that reconsideration under Rule 59

4   was not warranted because the court would "not rethink what it [had] already thought

5   through." (*Id.* at 63-64.)  Last, the court stated that, "[a]s a result of the October 8, 2020

6   Order, the IRS no longer [held] a penalty lien claim as to which it can apply the refund"

7   but the order did not "purport to decide how the IRS might otherwise apply the refund."

8   (*Id.* at 64.)

9   III.   Proceedings In This Court

10       On January 19, 2021, the government filed its initial brief challenging the

11   bankruptcy court's ruling.  (Doc. 7.)

12       On January 29, 2021, the Trustee filed a response brief.  (Doc. 10.)

13       On February 12, 2021, the government filed its reply brief.  (Doc. 11.)

14       On September 8, 2021, the Court issued a tentative ruling.  (Doc. 13.)

15       On September 20, 2021, at the government's request, the Court held oral argument.

16   (Doc. 14.)[7]

17                              **STANDARD OF REVIEW**

18       In the bankruptcy context, "[a] reviewing court will affirm a grant of summary

19   judgment only if it appears from the record, after viewing all evidence and factual

20   inferences in the light most favorable to the nonmoving party, that there are no genuine

21   issues of material fact and that the moving party is entitled to prevail as a matter of law.  A

22   bankruptcy court's grant of summary judgment is reviewed de novo." *In re Pioneer Tech.,*

23   *Inc.*, 107 B.R. 698, 700 (9th Cir. BAP 1988) (citations omitted).

24       …

25       …

26   _____

27   [7]     During oral argument, the government requested an opportunity to submit
     supplemental briefing on various issues, including the intersection between § 105(a) of the
     Bankruptcy Code and the bankruptcy court's application of the pro rata distribution
28   method.  This request is denied.  Because the tentative ruling (which discussed § 105) was
     issued nearly two weeks before oral argument, the government had an opportunity to
     address the issues in question (and, indeed, addressed them at length) during oral argument.

**ANALYSIS**

I.    <u>Allocation Of The Proceeds</u>

The bankruptcy court concluded that (1) because the Trustee avoided the Penalties and preserved the Penalties-related portion of the Tax Lien for the benefit of the estate, § 724(b) was inapplicable; and (2) the only allocation method of the Proceeds that made sense was pro rata.  The government challenges both conclusions, arguing that § 724(b) applies or, even if it doesn't apply, pro rata is an improper allocation method.  (Doc. 7 at 15-39.)

A.    **Applicability Of § 724(b)**

The parties dispute whether the Tax Lien, once the Penalties-related portion was avoided by the Trustee and preserved for the benefit of the estate, fell within the ambit of § 724(b).  Section 724(b) provides, in relevant part: "Property in which the estate has an interest and that is subject to a lien that is not avoidable under this title . . . and that secures an allowed claim for a tax, or proceeds of such property, shall be distributed" pursuant to a specified distribution scheme.  The parties don't dispute that the Proceeds are derived from property in which the estate has an interest, nor do the parties dispute that the Tax Lien secures an allowed claim for a tax.  Accordingly, the dispute is whether the Property (and Proceeds) are "subject to a lien that is not avoidable."

The government contends that the Tax Lien is a lien that is not avoidable because a portion of it—the Taxes portion—is unavoidable, and the "fact that the lien also includes an avoidable component does not make the not-avoidable components evaporate."  (Doc. 7 at 17.)  The government notes that "most federal tax liens . . . include an avoidable penalty component as part of a single lien" and cites 26 U.S.C. § 6321, which provides that the amount of owed taxes "including any interest . . . or assessable penalty . . . shall be a lien [singular] in favor of the United States."  (*Id.* at 17-18 & n.12.)  The Trustee responds that, because the single lien "secures two debts, one of which is avoidable (penalties), and the other of which is not (tax)," once a lien has been avoided in part, it "has two masters—the IRS and the trustee."  (Doc. 10 at 3-14.)  In reply, the government argues that what

- 12 -

remained after the avoidable portion was avoided by the Trustee was "a not-avoidable lien (plus an avoided/preserved lien)."  (Doc. 11 at 9.)

The Court begins with the text of § 724(b)—specifically, the phrase "not avoidable." The word "not," in this context, expresses negation.  The suffix "-able" in the term "avoidable" means "capable of, susceptible of, fit for, tending to, given to."  *-Able*, Webster's New Universal Unabridged Dictionary 5 (1996 ed.).  In context, the most logical definition of -able is "capable of."  Thus, the fairest reading of "not avoidable" is "not capable of being avoided" or "not able to be avoided."  Put another way, "not capable of being avoided" means that, to qualify as a lien under § 724(b), a lien must be unavoidable in its entirety (*i.e.*, it cannot be avoidable at all).

In reaching this conclusion, the Court is sympathetic to the government's position that, even if a portion of the lien is avoided, the lien in essence remains unavoidable, because an unavoidable portion is left.  The Court is also mindful that "[a]dhering to the fair meaning of the text . . . does not limit one to the hyperliteral meaning of each word in the text," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012) (emphasis omitted), and recognizes that reading "not capable of being avoided" too narrowly could risk interpreting the statute unfairly.  Nevertheless, although a close call, the Court agrees with the bankruptcy court that the Trustee's position is better supported by background bankruptcy principles and best harmonizes § 724(b) with other provisions of the Bankruptcy Code.

First, the Trustee's position is supported by the singular use of "lien" in Section 724(b), which suggests that when requiring a lien to be "not avoidable," the lien is referred to in its entirety, as opposed to being referred to in the teleological sense (*i.e.*, the lien is considered "not avoidable" if some unavoidable component parts make it an unavoidable lien in the end).  Other terms in the Bankruptcy Code have been interpreted in this manner. *Cf. In re Zohdi*, 234 B.R. 371, 376 & n.8 (Bankr. M.D. La. 1999) (holding that term "the transfer" (singular) is "talking about the entire transfer and is requiring that the entire transfer fit the consistency requirement" in part because "when the Code refers to 'a

transfer' or 'the transfer' it does not intend to place a limit upon the number of transfers that might be avoidable, as the plural is included in the use of the singular under" 11 U.S.C. § 102(7), but "use of the singular is instructive when the question is whether a part of a transfer is not avoidable, because the singular is used to connote a self-contained whole thing").  *See also In re Polanco*, 622 B.R. 631, 640 (Bankr. D.N.J. 2020) (citing *Zohdi* for the proposition that "section 102(7) of the Bankruptcy Code requires courts to read the singular 'transfer' as plural, so while multiple transfers may be avoided, the use of the singular requires that only whole transfers may be avoided, not parts of transfers"). "[U]nder the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law . . . ."  *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006) (internal quotation marks omitted).  Other courts' conclusion that the singular use of "transfer" refers to the entire transfer, not part of it, supports the conclusion that the singular use of "lien" refers to the entire lien, not part of it.  To hold otherwise would place the characterization of a lien with both avoidable and unavoidable components in a conundrum evocative of Schrödinger's cat: the lien itself is both avoidable and unavoidable, its true label awaiting the eventual action (or inaction) of the Trustee to avoid (or not avoid) part of the lien.  This ever-evolving classification is at odds with the static connotation of unavoid*able*.  To adopt the government's construction would require a lien to be unavoid*ed*.  Such a construction cannot be harmonized with the Bankruptcy Code.

Second, the government's interpretation would also create disharmony with other provisions of the Bankruptcy Code, such as §§ 551, 724(a), and 726.  The government argues that, once the Trustee avoided the avoidable portion of the Tax Lien, the distribution scheme in § 724(b) put the Trustee's new claim to the avoided-and-preserved lien at the bottom (*i.e.*, § 724(b)(6)).  (Doc. 7 at 20.)  But subordinating the avoided portion of the lien would be inconsistent with the Bankruptcy Code.  Once a lien is avoided under § 726(a)(4) (as the Penalties were), it is automatically preserved for the benefit of the estate. 11 U.S.C. § 551; *IRS v. Baldiga (In re Hannon)*, 619 B.R. 524, 533-34 (D. Mass. 2020).

When a lien is avoided and preserved, the Trustee steps into the shoes of the former lienholder and receives all of the former lienholder's rights and priority. *Haberman*, 516 F.3d at 1210 ("[T]he trustee, on behalf of the entire estate, assumes the original lienholder's position in the line of secured creditors; in this way, Congress sought to assure that the avoidance of a lien doesn't simply benefit junior lienholders who would otherwise gain an improved security position and might, when the estate is limited, prove the only beneficiaries of the trustee's actions."); *In re Van de Kamp's Dutch Bakeries*, 908 F.2d 517, 519 (9th Cir. 1990) (noting the "well-established principle that a trustee who avoids an interest succeeds to the priority that interest enjoyed over competing interests"). In other words, the Trustee occupies the same place in line as the original lienholder. To displace the Trustee's priority, as the government urges, would be inconsistent with the nature of preservation.[8]

Third, displacing the Trustee's priority would also be inconsistent with § 724(b)'s distribution scheme itself. "[A]s a general rule, if a lien is perfected, it must be satisfied out of the asset(s) it encumbers before any proceeds of the asset(s) are available to unsecured claimants, including those having priority . . . ." *In re Darnell*, 834 F.2d 1263, 1265 (6th Cir. 1987). Section 724 "sets forth an exception to the general rule that priority claims do not affect perfected secured claims." *Id.* at 1266. Courts have interpreted § 724(b) as subordinating tax liens but leaving the priority of other specified liens otherwise undisturbed. *Id.* at 1267 ("The legislative history clarifies that the result of these subsections [is] to leave senior and junior lienors and holders of unsecured claims undisturbed.") (cleaned up); *In re Navis Realty, Inc.*, 193 B.R. 998, 1004 (Bankr. E.D.N.Y. 1996) (same); 6 Collier ¶ 724.03[5d] (noting that § 724(b) "has no effect on liens that are junior or senior to a tax lien" but instead "adjusts distributions between the holders of tax liens and priority claims, without affecting other lienholders"). Adopting the government's position would essentially take the Trustee's priority, in the shoes of the original lienholder,

---

[8]     The government acknowledges that its reading of § 724(b) "may sometimes, if not often, be in tension" with § 551. (Doc. 11 at 13.)

and turn it on its head, requiring all other junior liens and secured claims to be satisfied first.  *Darnell*, 834 F.2d at 1268-69 ("Under § 724, property is not distributed to the estate (§ 724(b)(6)) until *all* liens, both tax and nontax, are satisfied. . . .  [B]y its terms, property distributed under [§ 724] does *not* become part of the estate unless or until all secured claims have been satisfied.").

For these reasons, the Court agrees with the bankruptcy court that the best way to harmonize §§ 724 and 551 is to read 724(b) as inapplicable when an avoidable lien is involved.  (Doc. 7-8 at 32.)

Although the case law is admittedly sparse on this issue, two other courts have suggested that the government's proposed interpretation of § 724(b) is incorrect.   In *Hannon*, a trustee brought an adversary proceeding against the IRS to avoid secured claims for penalties (and interest) and to preserve the avoided claims for the benefit of the estate. 619 B.R. at 527.  The court held that the trustee could avoid the penalties under § 724(a) and preserve them for the benefit of the estate under § 551. *Id.* at 533-34.  The IRS argued that § 724(b) "ensures that proceeds from tax-lien-encumbered property accrue to the estate only after all unavoidable liens have been satisfied." *Id.* at 534.  The court disagreed, stating that although the "IRS's argument [was] enticing" on its face, a "cursory reading of §§ 724(a) and (b), 726 and 551 . . . reveal[ed] an inherent flaw." *Id.*  "By avoiding the penalty and interest on penalty portions of the IRS liens, those funds are no longer 'not avoidable' and, therefore, not subject to § 724(b).  The relevant provisions . . . make clear that distributing funds from an estate to compensate the IRS for a tax penalty rather than preserving such funds for the unsecured creditors is disfavored [under § 726] . . . .  That is the reason § 724(a) provides for the avoidance of the penalty portion of a lien for the benefit of the estate and not for the benefit of holders of later recorded liens." *Id.*

In *In re Hutchinson*, 615 B.R. 596 (E.D. Cal. 2020), *vacated as moot*, *United States v. Hutchinson*, 2020 WL 5551702 (9th Cir. 2020), the question was "whether the tax and interest portion of the IRS's five liens enjoy a higher priority over the penalty portions of the liens, despite each lien being comprised of tax, interest, and penalties at recordation."

*Id.* at 602.  The government argued that the "five liens [were], in essence, divisible" and, "[o]nce divided . . . the tax and interest portions receive distributions first, given their priority order under § 724(b)."  *Id.* at 602-03.  The trustee, on the other hand, argued that because "each of the five IRS liens contain[ed] both an avoidable portion and a portion that [could not] be avoided . . . the first lien's avoidable portion (penalties) [would be] preserved for the benefit of the estate and deducted from any sale proceeds at the time the tax and interest portions of the liens receive distributions," a process that would be "repeated with respect to the second, third, fourth, and fifth liens, or until such time as all of the property sale funds [were] exhausted."  *Id.* at 603.  After a thorough discussion of available case law, the court agreed with the trustee, concluding that "when a trustee avoids an encumbrance under the federal bankruptcy code, the lien's priority remains intact."  *Id.* at 607.  The court noted that a "close reading of §§ 724, 726, and 551 together" demonstrated that "the penalty portion of an IRS lien may be avoided and preserved for the benefit of the estate—not the benefit of the junior lienholder, which in this case is the IRS."  *Id.* at 607-08.[9]

As the government points out (Doc. 7 at 25-28), *Hannon* and *Hutchinson* did not address the precise question before the Court today—whether a single lien that is partially avoidable and partially not falls within the scope of § 724(b).  Nevertheless, their holdings are persuasive[10] and bolster the Court's conclusion that the Trustee's interpretation is more

---

[9]     The Court does not view *In re Bolden*, 327 B.R. 657 (Bankr. C.D. Cal. 2005), which was cited by the bankruptcy court and is discussed in the parties' briefs, as particularly illuminating because the *Bolden* court did not provide any reasoning in support of its conclusion that the penalties portion of a tax lien avoided by the trustee would be distributed according to § 726, not § 724(b).  *Id.* at 666.  Also, the *Bolden* decision appears to take inconsistent approaches as to how the distribution would occur—the table appearing at page 665 of the opinion seems to suggest that the tax portion would be paid before the penalties portion, but a statement on page 667 ("Pursuant to §§ 724(a) and 551, the trustee would receive from the sale proceeds about $339,272 in avoided tax penalties and avoided interest on tax penalties") can be construed as suggesting the distribution would occur on a pro rata basis.

[10]    *Hutchinson* was vacated as moot by the Ninth Circuit.  *United States v. Hutchinson*, 2020 WL 5551702 (9th Cir. 2020).  This does not preclude the Court from finding its reasoning persuasive.  *Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n.14 (9th Cir. 2014) ("[D]ecisions vacated for reasons unrelated to the merits may be considered for the persuasive[ness] of their reasoning."); *Harris v. Bd. of Governors of Fed. Rsrv. Sys.*, 938 F.2d 720, 723 (7th Cir. 1991) ("[A]lthough it is customary when a case becomes moot on

aligned with the Bankruptcy Code.  Both decisions support the notion that a lien that consists of both avoidable and unavoidable components isn't "not avoidable" within the meaning of § 724(b)—*Hannon* in its observation that an avoided portion of the lien doesn't fall within § 724(b) because it is no longer "not avoidable," and *Hutchinson* in its conclusion that an avoided part of a tax lien would receive distributions at the same time as the tax portion of the lien.

Last, the government argues that any ambiguity in § 724 "should be construed in the government's favor" because of sovereign immunity.  (Doc. 7 at 29-30.  *See also* Doc. 11 at 16 ["If the Court determines § 724 is ambiguous, those ambiguities should be resolved in the government's favor."].)  For the reasons explained above, the Court does not view § 724(b) as ambiguous.  The Court thus need not address this argument.

To summarize, the bankruptcy court did not err in holding that the distribution scheme in § 724(b) was inapplicable to the Tax Lien.[11]

B.     **Pro Rata Allocation**

Because § 724(b) does not apply to the allocation of the Proceeds, the next question is whether the bankruptcy court erred in allocating the Proceeds in a pro rata fashion between the Taxes (held by the government) and the avoided Penalties (held by the Trustee).

1.     The Parties' Arguments

The government argues that a pro rata approach "is without statutory basis" and that, to the extent the portions of the Tax Lien are equal in priority, "a tie goes to the IRS." (Doc. 7 at 30-31; Doc. 11 at 17-18.)  The government also argues that a pro rata approach is illogical because it would "deprive the United States not only of its avoidable penalties,

---

appeal for the appellate court to order all previous orders in the case vacated, the only effect of the vacatur is to deprive those orders of any preclusive effect in subsequent litigation. It does not deprive them of such stare decisis effect as they may have, modest . . . though such effect is in the case of an order by a district court.") (citations omitted).

[11]     Given this conclusion, it is unnecessary to address the government's argument that the avoided Penalties do not meet the requirements of § 724(b)(1) (Doc. 7 at 20-25; Doc. 11 at 9-10) or that "operation of § 724(b) should precede the operation of § 726, as suggested in § 725" (*id.* at 28-29).  These arguments lack merit because, as discussed above, § 724(b) is inapplicable.

as § 724(a) directs, but of its not-avoidable taxes and interest, which is far from the intent of § 724(a) to avoid punishing creditors for the debtor's misconduct."  (Doc. 7 at 31-34.) Last, the government argues that the Taxes should be paid in full before the Penalties because "the penalties and interest would not exist unless and until there is a tax liability" because, "in many cases[,] some or all of the penalties and interest accrue only after the tax."  (*Id.* at 39; Doc. 11 at 17.)

The Trustee responds that "[e]quity recognizes that, where there is one fund of money to be divided among equal claimants, the distribution of that fund should be on a *pro rata* basis," which is the case here—"there is a fund of money from the sale . . . which is subject to a single lien, and there are two parties with equal rights to the proceeds of that lien."  (Doc. 10 at 4 n.3.)  The Trustee also argues that the "remedy for avoided transfers," § 550(a), is "an equitable remedy and the [bankruptcy court] is permitted, within its discretion, to fashion a remedy consistent with the purpose of making the bankruptcy estate whole."  (*Id.* at 5.)  As for the government's last argument, the Trustee argues (when addressing a different part of the government's brief) that "both the taxes and the penalties became secured at exactly the same time when the lien was recorded, without regard to which debt arose first."  (*Id.* at 12.)

The government replies that the Trustee may not rely on § 550 for allocation of the Proceeds because it is an alternative remedy to preservation, not a supplementary one. (Doc. 11 at 4-5.)  "Preserving a lien," the government argues, "is inconsistent with recovering its value from the holder of the avoided lien."  (*Id.*)  The government further argues that the lien became effective upon assessment of the Taxes, so when the lien was recorded is irrelevant for purposes of determining priority.  (Doc. 11 at 17.)

2.   Analysis

The bankruptcy court did not identify any basis in the Bankruptcy Code for allocating the Proceeds on a pro rata basis.  (Doc. 7-8 at 35 ["I'm going to go ahead and adopt the Trustee's position, although I was not able to find any cases [or] authority either way on this, that the proper method to handle it would be to share pro rata."].)  According

to the Trustee, the absence of an applicable Code provision means the bankruptcy court was entitled to consider equitable principles when deciding how the proceeds should be allocated.

Although the Court ultimately agrees with the Trustee that the bankruptcy court did not err by considering equitable principles (and performing a pro rata allocation pursuant to those principles), the Trustee skips a step in the analytical process by suggesting that it is unnecessary to identify an applicable Code provision.  The Supreme Court has "long held that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."  *Law v. Siegel*, 571 U.S. 415, 421 (2014) (internal quotation marks omitted).  Thus, it is necessary to determine whether application of the pro rata allocation method in these circumstances is permitted by some provision of the Bankruptcy Code.

The Trustee proffers § 550 as a potential source of authority.  However, "Section 550 affords the Trustee a cause of action separate from the substantive avoidance sections . . . .  Preservation is automatic, while recovery is not.  Recovery is necessary only when the remedy of avoidance, and therefore of preservation, is inadequate."  *In re Bremer*, 408 B.R. 355, 359 (10th Cir. BAP 2009), *aff'd sub nom In re Trout*, 609 F.3d 1106 (10th Cir. 2010).  *See also In re Taylor*, 599 F.3d 880, 890 (9th Cir. 2010) (citing *Bremer* with approval).  Because the Trustee avoided the Tax Lien under § 724(a) and preserved it for the benefit of the estate under § 551, he could not pursue a remedy under § 550 unless preservation was inadequate—an argument the Trustee did not make before the bankruptcy court.  The Trustee's reliance on § 550 as a permissible basis for the bankruptcy court's allocation method is thus unavailing.  As the government notes, "[w]hen a trustee successfully avoids a lien, the default 'remedy' is § 551."  (Doc. 11 at 5.)

As for whether pro rata distribution is a permissible approach under § 551, this appears to be a matter of first impression.  The Court concludes that, because pro rata allocation is not *in*consistent with § 551 and furthers the purposes of that provision, it was therefore permissible for the bankruptcy court to follow that approach pursuant to a

different provision of the Bankruptcy Code, § 105(a), which vests bankruptcy courts with the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" so long as the action does not contravene a different, more specific provision of the Bankruptcy Code.  *See generally Law*, 571 U.S. at 420-21 (noting that, under § 105(a), "[a] bankruptcy court has statutory authority to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the Bankruptcy Code" but that "in exercising those statutory . . . powers, a bankruptcy court may not contravene specific statutory provisions" and may not "override explicit mandates of other sections of the Bankruptcy Code") (citations and internal quotation marks omitted); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) ("[Section 105(a) is] consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

As noted, the purpose and effect of preservation under § 551 is to maintain the status quo of lien priority, notwithstanding that the avoided lien (or portion of the lien) changes hands and is held by the trustee.  Allocating proceeds in a manner other than pro rata would disrupt this purpose.  To adopt the government's allocation—distributing the Proceeds first to the Taxes and then, if there are any Proceeds left, to the Penalties—would in effect subrogate the Trustee's lien to the government's and make it a junior lien.  But under § 551, "the trustee . . . steps into the shoes of the holder of the avoided lien and the lien's priority remains the *same* as it was with respect to other liens prior to avoidance."  *Hutchinson*, 615 B.R. at 607.  "[W]hile only [a] portion[] of the . . . IRS lien[] [is] avoided, there is no authority suggesting the avoided parts should be considered as separate, distinct, and junior liens vis-à-vis the unavoided portions of the same lien[]."  *Id.* at 607 n.10.  A pro rata allocation is thus consistent with § 551.  *Cf. In re Nettel Corp.*, 2017 WL 5664840, *7 (Bankr. D.D.C. 2017) ("[Section] 330(a)(5) does not explicitly prohibit disgorgement of interim fees to enforce § 726(b), and therefore under *Law*, disgorgement is still a remedy

that courts may use under § 105(a) to enforce § 726(b).").

During oral argument, when asked to identify which provision of the Bankruptcy Code the bankruptcy court's pro rata approach violated, the government pointed to § 725. In response, the Trustee argued that § 725 "is nothing more than a clean-up provision" and is inapplicable in this circumstance. The Court agrees with the Trustee, for the reasons stated during oral argument and in the Trustee's response brief. (Doc. 10 at 6.)

The government has not identified any provision of the Bankruptcy Code with which pro rata allocation would conflict (other than § 724(b), which the Court has already found inapplicable here). Although the government argues that pro rata distribution has no basis in the Bankruptcy Code (Doc. 7 at 30), a pro rata approach is not verboten under the Bankruptcy Code. Indeed, the bankruptcy trustee's "role is to manage the estate and gather up all available property . . . for an *eventual pro rata, monetary distribution* among the debtor's creditors." *Lincoln Elec. Co. v. Manahan*, 2011 WL 3516201, *4 (N.D. Ohio 2011) (emphasis added). *See also CAMOFI Master LDC v. Spradlin*, 2017 WL 4478332, *5 (E.D. Ky. 2017) ("A bankruptcy, in its simplest terms, reduces . . . property to a single asset, of which the Trustee is the sole representative authorized to marshal and distribute from the 'pot,' *pro rata*, among those with allowed claims."). The notion that a pro rata approach here is inconsistent with the Bankruptcy Code is belied by its ingrained ubiquity in the bankruptcy process. *See, e.g.*, *Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property."); *Matter of Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993) (bankruptcy court erred in using its equity powers to "deviate[] from the pro rata scheme of distribution envisioned by the Code [in § 726(b)]"); *CAMOFI*, 2017 WL 4478332 at *6 (noting that "equitable distribution . . . is at the very core of Bankruptcy"); *In re IFC Credit Corp.*, 422 B.R. 659, 662 (Bankr. N.D. Ill. 2010) (noting the "Bankruptcy Code's core goals of *pro rata* distribution and orderly administration of a bankruptcy estate"); *In re Jeter*, 171 B.R. 1015, 1023 (Bankr. W.D. Mo. 1994) (noting the "Code's policy of pro rata distribution").

The government offers several policy arguments as to why a pro rata allocation is undesirable from the IRS's perspective (Doc. 7 at 31-39; Doc. 11 at 6-8, 11-14), but it is not this Court's role to weigh policy arguments. Nor is it this Court's role to substitute its judgment for that of the bankruptcy court where the bankruptcy court acted within its discretion and authority under the Bankruptcy Code. *See, e.g.*, *In re Conejo Enters., Inc.*, 96 F.3d 346, 351 (9th Cir. 1996) ("Decisions committed to the bankruptcy court's discretion will be reversed only if based on an erroneous conclusion of law or when the record contains no evidence on which [the bankruptcy court] rationally could have based that decision.") (alteration in original) (internal quotation marks omitted). The bankruptcy court did not err in allocating the Proceeds pro rata.[12]

II.    Allocation Of The Refund

The last portion of the government's brief challenges the bankruptcy court's ruling concerning the Refund. (Doc. 7 at 40-45.) The government argues that, although the ruling "purports not to decide the refund dispute," its allocation of specific dollar amounts under the pro rata approach "implicitly rejected the United States' argument that any 2017 overpayment . . . should *first* be applied to the penalty component of the lien." (*Id.* at 40.) The government further argues that, because the Refund was an overpayment that arose before Debtors filed for bankruptcy, the government has the discretion to allocate the Refund retroactively to the Penalties, in effect increasing the proportion of the Tax Lien attributable to the Taxes and, therefore, increasing the government's pro rata share of the Proceeds. (*Id.* at 40-45.) The Trustee disagrees, arguing that the bankruptcy court "didn't tell the IRS had to do with the overpayment" and that the government is "not free to apply

---

[12]    The government cites *In re Seneca Balance, Inc.*, 114 B.R. 378 (W.D.N.Y. 1990) to support its position that "funds should be allocated to taxes first, then to penalties." (Doc. 7 at 39; Doc. 11 at 7.) In *Seneca Balance*, the bankruptcy court determined how to allocate the value of property "amongst the various components of [a single tax] lien, tax, interest, and penalty." 114 B.R. at 379. The court held that the value should be applied first to the tax because "it is the tax which comes first" and is "the genesis of the interest and penalty." *Id.* The court noted that such an allocation was "consistent with the 'historic hostility' to claims for penalties in bankruptcy proceedings." *Id.* *Seneca Balance* is unpersuasive because, there, the entire tax lien (tax, penalties, and all) was held by the IRS. Here, the Tax Lien is held by both the government and the Trustee, and the "historic hostility" to penalty claims was realized by the Trustee's avoidance of the Penalties.

this overpayment to the penalties" given that the Penalties portion of the Tax Lien is now held by the Trustee. (Doc. 10 at 14-16.)

The Court agrees with the government that the bankruptcy court erred in allocating specific amounts of the pro rata shares of the Proceeds when it had not yet determined whether the government was entitled to retroactively offset the balance owed on the Tax Lien. If the government is correct that it may apply the Refund to the Penalties portion of the Tax Lien retroactively, then the specific proportions of the Taxes and Penalties portions of the Tax Lien are subject to change, as are the pro rata shares of the Proceeds. The Court declines to resolve whether the government is actually entitled to offset the Refund because the bankruptcy court did not address that issue (or, at least, did not explicitly attempt to address that issue) in the first instance. The Court thus reverses the bankruptcy court's specific allocation of the Proceeds and remands to the bankruptcy court to address whether the government may retroactively apply the Refund to offset the Penalties.

Accordingly,

**IT IS ORDERED** that:

(1) The grant of summary judgment to the Trustee is **affirmed in part and reversed in part**. The Clerk of Court is directed to enter judgment accordingly; and

(2) This case is remanded to the U.S. Bankruptcy Court for the District of Arizona for further proceedings not inconsistent with this Order. The Clerk of Court is directed to close this case.

Dated this 27th day of September, 2021.

_____
Dominic W. Lanza
United States District Judge